# In the United States Court of Appeals for the Eighth Circuit

---

PEOPLE OF STATE OF CALIFORNIA, APPELLANT

*v.*

23ANDME HOLDING COMPANY, ET AL, APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI (CIV. NO. 25-999)
(THE HONORABLE MATTHEW T. SCHELP, J.)*

---

**DEBTORS' RESPONSE TO APPELLANT'S MOTION TO STAY APPEAL**

---

PAUL M. BASTA
CHRISTOPHER HOPKINS
WILLIAM A. CLAREMAN
JEFFREY J. RECHER
JESSICA I. CHOI
GRACE C. HOTZ
LYUBA SHAMAILOVA
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas
  New York, NY 10019*

KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
  *2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300*

THOMAS H. RISKE
NATHAN R. WALLACE
JACKSON J. GILKEY
CARMODY MACDONALD P.C.
  *120 S. Central Avenue, Suite 1800
  St. Louis, MO 63105*

## PARTIES TO THE PROCEEDING
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.l(c), Appellee debtors state the following. The debtors in each of these cases are: 23andMe Holding Co.; 23andMe, Inc.; 23andMe Pharmacy Holdings, Inc.; Lemonaid Community Pharmacy, Inc.; Lemonaid Health, Inc; Lemonaid Pharmacy Holdings Inc.; LPharm CS LLC; LPharm INS LLC; LPharm RX LLC; LPRXOne LLC; LPRXThree LLC; and LPRXTwo LLC. Debtor 23andMe Holding Co. has no parent corporation, and no publicly held corporation owns 10% or more of its stock. The remaining debtors are directly or indirectly wholly owned subsidiaries of 23andMe Holding Co.

Appellee debtors submit this opposition to appellant California's motion to reverse the district court's denial of the motion to stay the bankruptcy order approving a sale of the debtors' assets to TTAM Research Institute under section 363(b) of the Bankruptcy Code. This is California's third attempt to obtain an extraordinary stay of the bankruptcy order. The motion to stay should be denied for the same reasons it has already been denied by both the bankruptcy and district courts: California cannot prevail on any of the four factors that courts must consider in evaluating a motion to stay. For that reason—and because significant harm will result to debtors from any further delay—California is also not entitled to an interim stay pending the Court's resolution of this motion.

## BACKGROUND

1. 23andMe is an American personal genomics and biotechnology company that offers DNA testing directed at health and ancestry research. Despite the revolutionary nature of the Company's business and its positive impacts on the lives of millions of its customers, over the last three years, 23andMe, like many other companies, has suffered as rising inflation increased the Company's operating expenses and downward trends in consumer spending negatively impacted their sales. These chapter 11 cases were commenced

1

as a result of mounting operating losses and uncertain litigation liabilities to conduct a value-maximizing sale of all or substantially all of 23andMe's assets. The debtors conducted a highly competitive initial auction from May 14 to 16, 2025; following litigation in the Bankruptcy Court, the parties agreed to a final bidding round that took place on June 13.

2. TTAM emerged as the winning bidder at $305 million. The debtors then filed a notice of the winning bidder, which attached TTAM's amended asset purchase agreement. The agreement contemplated a sale of the debtors' assets to TTAM but also allowed the debtors to make an election to structure the transaction in other ways, either as an equity sale (through the "Equity Sale Toggle") or as a plan sale pursuant to a chapter 11 plan (through the debtors exercising the "Plan Toggle"). D. Ct. Dkt. 41 §§ 2.8, 11.8.

The TTAM agreement contains representations and warranties by the debtors regarding their ability to transfer acquired assets, including the personal information targeted by California's stay request, as of the time of closing. *See id.* §§ 5.1(l), (w). If those requirements and warranties are breached, TTAM can terminate the APA. *Id.* §§ 9.1(a), 10.1(e). The agreement's closing conditions also preclude the TTAM sale from closing if there is (1) an order

2

"restraining, enjoining or otherwise prohibiting . . . the Closing" or (2) a stay of the sale order at the time of the closing. *See id.* §§ 9.3 (a), (b).

3. In advance of the bankruptcy court's hearing on the proposed TTAM sale, 34 States objected. Those States, including California, argued that directly selling 23andMe's operating assets under the TTAM agreement violated their statutes governing the transfer of genetic data. Many of the States filed objections expressly differentiating between two types of corporate transactions that could result in a "change in ownership" of customers' genetic data: a sale of company assets (which they alleged would violate state law governing transfer of genetic data) and a sale of equity (which they acknowledged "is legally possible"). *See* D. Ct. Dkt. 35-3 at 13.

In view of the States' position that the sale of equity (as opposed to a sale of assets) would not violate their state laws, the debtors elected to exercise the Equity Sale Toggle and structure the transaction to address those states' concerns. Pursuant to the Equity Sale Toggle, which was subject to the bankruptcy court's approval, the debtors would form a NewCo, a new wholly owned, non-debtor subsidiary, and then effect the transaction in two steps: *first*, the debtors would sell the acquired assets and assumed liabilities to NewCo; *second*, the debtors would sell 100% of the equity interests in NewCo

3

to TTAM.  *See* D. Ct. Dkt. 35-4 at 25–29.  TTAM will then own NewCo, the entity holding the operating business and information that is the subject of this proceeding.

4.      The bankruptcy court held a two-day hearing on the sale on June 18 and 20.  During the hearing, 29 of the then-objecting States agreed not to further prosecute their objections in light of the Equity Sale Toggle and additional privacy enhancements TTAM agreed to if the sale is approved.  After hundred of pages of briefing and the two-day hearing, on June 27, the bankruptcy court overruled the remaining five States' objections, including California's, and approved the sale in a 38-page opinion.

On July 3, California appealed the sale order to the district court; the other remaining States did not appeal.  On the evening of July 4, California filed a motion in the bankruptcy court for a stay of the sale order pending appeal.  On July 7, 2025, the bankruptcy court held an almost three-hour hearing on the motion to stay and, following evidence and argument, denied the motion, finding that not a single factor supported California's application for a stay.

On the evening of July 7, California appealed to the bankruptcy court and immediately sought a stay in the district court.  The district court entered

a temporary administrative stay until it conducted a hearing on California's request. On July 10, after briefing and argument from the parties, the district court held that the bankruptcy court did not abuse its discretion in declining to grant the stay; it proceeded to emphasize concluded that all four stay factors weighed against a stay. The district court extended the administrative stay until 11:59 p.m. on July 11.

5. On July 10, California filed a notice of appeal in this Court of "the order of the District Court for the Eastern District of Missouri, entered in this case on July 10, 2025, denying the People's Emergency Motion for a Stay Pending Appeal. [Dist. Ct. Dkt. No. 49.]." Notice of Appeal. Just before 1 p.m. on Friday, July 11, California filed its emergency motion to stay. *See* Mot.

## ARGUMENT

## I.   THE COURT LACKS JURISDICTION OVER CALIFORNIA'S APPEAL

As a preliminary matter, to the extent that California seeks to appeal the district court's denial of the motion to stay, the Court need not reach the merits of this appeal; it should be dismissed for lack of jurisdiction. California noticed its appeal as an appeal "from the order of the District Court for the Eastern District of Missouri, entered in this case on July 10, 2025, denying the People's Emergency Motion for a Stay Pending Appeal. [Dist. Ct. Dkt. No.

5

49.].”  Notice of Appeal; *see* Mot. 1 (“The People thus request that this Court reverse the District Court's order and stay the sale[.]”).  But “[t]he denial of a stay pending appeal is not an appealable order.”  *Liddell by Liddell* v. *Board of Education of the City of St. Louis*, 105 F.3d 1208, 1212 (8th Cir 1997).  “When a district court, acting in its appellate capacity, denies a stay of a bankruptcy order pending appeal, the court of appeals lacks jurisdiction to review that interlocutory order.”  *In re Atencio*, 913 F.2d 814, 816 (10th Cir. 1990), *holding modified by Temex Energy, Inc.* v. *Underwood, Wilson, Berry, Stein & Johnson*, 968 F.2d 1003 (10th Cir. 1992); *In re Sipka*, 940 F.2d 1539, 1991 WL 144867, at *1 (10th Cir. Aug. 1, 1991) (Table); *see In re Sinha*, 605 F. App'x 664 (9th Cir. 2015) (concluding that “[w]e lack jurisdiction over this appeal because the [Bankruptcy Appellate Panel's] order denying Sinha's motion for a stay pending appeal was not a final order”) (Memorandum).  The Court therefore should dismiss the appeal on that basis.

## II.  CALIFORNIA IS NOT ENTITLED TO A STAY PENDING APPEAL

To the extent that California seeks an extraordinary motion for a stay pending an appeal of the bankruptcy court's stay order to the district court, California is not entitled to a stay.  When deciding a motion to stay pending appeal, courts consider four familiar factors “(1) whether the stay applicant

6

has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Kansas* v. *United States*, 124 F.4th 529, 533 (8th Cir. 2024) (quoting *Nken* v. *Holder*, 556 U.S. 418, 426 (2009)). "The most important factor is likelihood of success on the merits, *although a showing of irreparable injury without a stay is also required*." *Id.* (quoting *Brakebill* v. *Jaeger*, 905 F.3d 553, 557 (8th Cir. 2018)). All four factors weigh against a stay. California bears the burden of showing that a balance of those factors warrants a stay. *See id.* It has—once again—failed to come close to doing so—especially where, as here, California requests that this Court stay the proceedings in the district court, when the district court itself has already determined no such stay is necessary.

## A. California Fails to Demonstrate a Strong Showing of Likelihood of Success on Appeal

Section 363(b) of the Bankruptcy Code provides that, "after notice and a hearing," the Debtors may "sell . . . other than in the ordinary course of business, property of the estate." California argues it is likely to prevail because (1) the TTAM sale violated states' (including California's) genetic pri-

vacy laws and (2) the Equity Sale Toggle violated section 363 of the Bankruptcy Code because the first step in the transaction involved transferring genetic information to a newly formed, wholly owned subsidiary. Mot. 10-11; *see* D. Ct. Dkt. 35-5 at 19–30. As both lower courts determined in denying California a stay, California is mistaken.

1. As a preliminary matter, California cannot show a likelihood of success on the merits because it lacks standing to even bring its suit. Appellate standing in bankruptcy proceedings is "more limited than Article III standing or the prudential requirements associated therewith." *In re O & S Trucking, Inc.*, 811 F.3d 1020, 1023 (8th Cir. 2016) (internal quotation marks and citations omitted). "[T]o have standing to appeal from an order of the bankruptcy court, the appellant must have been aggrieved. A person is aggrieved if he is directly and adversely affected *pecuniarily* by the order. This principle limits standing to persons with a *financial stake* in the bankruptcy court's order." *In re Patriot Co.*, 303 B.R. 811, 815 (B.A.P. 8th Cir. 2004) (internal quotation marks and citations omitted) (emphases added); *In re Wigley*, 886 F.3d 681, 684 (8th Cir. 2018) (appellate standing available only "if a bankruptcy court order diminishes the person's property, increases the person's burdens, or impairs the person's rights" (internal quotation marks and citations omitted)). California

8

does not assert *any* pecuniary or financial interest that would be adversely affected by the sale order, and it thus lacks standing to appeal it.

Moreover, California's appeal asserts interests of California consumer creditors. As the bankruptcy court determined, California is thus barred from appealing the sale order under Bankruptcy Rule 2018(b). *See* Fed. R. Bankr. Proc. 2018(b) ("[A] state attorney general may appear and be heard on behalf of *consumer creditors* . . . But the state attorney general *may not appeal from any order* . . . *entered in the case*." (emphases added)); D. Ct. Dkt. 35-10 at 76:8–24; Ex. A, July 10, 2025, Stay Hr'g Tr. at 44:2–6 (district court noting Bankruptcy Rule 2018(b) "likely applies").

2. As the lower courts concluded, California also has identified no legal theory on which it could succeed on the merits—let alone one with which it can show a strong likelihood of success.

a. California's primary argument on the merits is that GIPA provides that "a direct-to-consumer genetic testing company shall . . . obtain a consumer's separate and express consent for . . . [e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider." Cal. Civ. Code § 56.181(a)(2)(D). California asserts that the bankruptcy court misread this law when it held that the TTAM

9

sale did not involve a transfer to a "third party." Mot. 12. But the bankruptcy court's "thoughtful textual consideration," Ex. A at 44:8–13, led to the determination that the NewCo sale did not violate GIPA because (1) the term "third party"—which is undefined under GIPA—"is commonly understood to exclude affiliates," D. Ct. Dkt. 35-5 at 25, and (2) GIPA contains an "implicit exception for subsidiaries or affiliates of the company," *id.* at 23. Two bites at the apple later, California still has no response for either argument.

b.    California has no response for the reality that the bankruptcy court's reading gave "the words their usual, ordinary meaning," in accordance with principles of statutory construction used by California courts. *Id.* (internal quotation marks and citation omitted). Instead, California argues that the lower court's interpretation of the statute erroneously created a "loophole" by allowing a company to create a subsidiary and then sell the equity of that subsidiary to a buyer, thereby "evadi[ng]" GIPA. Mot. 14. But the bankruptcy court applied the plain language of the statutory text in determining that nothing in GIPA "purports to prohibit or condition a change of ownership of or sale of equity in a direct-to-consumer testing company." D. Ct. Dkt. 35-5 at 26. Indeed, California *conceded* that point in the bankruptcy court:

> THE COURT:  .  .  .  So as I understand it, and I think this applies to all five [objecting] states, the state regulates transfers of

genetic information but not ownership of the companies that hold that information; is that fair?

MR. NADAL: I believe that's fair, Your Honor.

D. Ct. Dkt. 36 at 300:15–19.

The bankruptcy court did not create a "loophole"; it merely interpreted the scope of the statute in accordance with its plain meaning and consistent with California's *own position*. Nor is there any "loophole" present here at all: as the district court agreed, GIPA plainly does not regulate transfers of ownership interests in a genetic testing company. Ex. A at 44:11–13 ("GIPA does not prohibit a change of ownership of or a sale of equity in a direct to consumer testing company."). If California's view were adopted, GIPA would be violated every time the (previously) publicly traded stock of 23andMe traded on Nasdaq. That cannot be the case.

c. California also now argues (as it previously did without success) that it can show a likelihood of success because "third party" in GIPA includes wholly owned subsidiaries. But both of the lower courts rejected that argument—and California cites no contrary case law.

d. California's other arguments are equally unavailing. California argues that the transaction structure "is outside the bounds of what can be accomplished through § 363" and violates the "Bankruptcy Code's procedures

Appellate Case: 25-2361    Page: 13    Date Filed: 07/11/2025 Entry ID: 5536290

and protections." Mot. 10–12. But California fails to explain how the text of Section 363 prohibits the TTAM sale, or why the bankruptcy court allegedly got it wrong. California does not argue that a debtor is prohibited from selling substantially all of its assets under Section 363, and California cites no authority supporting the claim that the NewCo Sale is an inappropriate way to structure such a sale.

The debtors formed NewCo with the bankruptcy court's express authorization of the sale order under Section 363(b), defeating any claim that the debtors are acting outside of the bounds of their authority in forming NewCo. D. Ct. Dkt. 35-1 ¶ 7. Nor are California's allegations of "gamesmanship" credible. The debtors pivoted to this transaction structure not to "violate" state law, but precisely because numerous States made clear that a sale of equity *complied* with state law and would resolve their objections. The Equity Sale Toggle helped resolve objections from 28 of those States.

California also asserts that "there are no wasting assets being sold here that would necessitate a § 363 sale." Mot. 9–10. But the debtors can sell assets under section 363 whether they are "wasting assets" or not. *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983). In any event, there *are* wast-

12

ing assets here; the debtors are not profitable and expend hundreds of thousands of dollars *per day*.  D. Ct. Dkt. 35-7 ¶¶ 8–9.  An expeditious closing of the TTAM sale is critical to economic recoveries for stakeholders.

3.      Even apart from the weakness of California's affirmative arguments, there are other flaws fatal to any chance of success by California.  *First*, the Bankruptcy Code preempts state law that would prohibit a sale that is expressly authorized under section 363, *see* D. Ct. Dkt. 35-6 ¶¶ 100–05, an argument the district court believed "further reduces California's likelihood of success on the merits."  Ex. A at 44:14–16.  *Second*, GIPA by its terms does not restrict transfers *within* a genetic testing company.  That is all the sale from the debtors to NewCo accomplishes given the entities are under common ownership and control—it only restricts transfers *from* a genetic testing company. D. Ct. Dkt. 35-5 at 21 n.13.

4.      Finally, California has no response for the practical reality that the results that would necessarily follow from its approach are absurd.  The bankruptcy court highlighted this, identifying numerous such examples of absurdity that would necessarily follow from that view;  to date, California has never addressed or distinguished those.  The bankruptcy court concluded that "[t]o interpret these statutes to require separate express consent for every

13

transfer to an affiliate would hamper a genetic-testing company's ability to organize itself, to operate, and, in important respects, to protect the interests of customers." *Id.* at 23–24.

5.    California also argues that TTAM and NewCo are not entitled the protections of section 363(m) of the Bankruptcy Code. But that argument is irrelevant to success on the merits, because section 363(m) deals only with the *remedies* available on appeal; it has nothing to do with California's chances of obtaining a reversal of the sale order on appeal. Section 363(m) simply provides that, *if* the sale order is reversed or modified on appeal, it would not affect the validity of the sale if the purchaser is a "good faith" purchaser. That has no bearing here.

## B.    California Fails to Demonstrate Irreparable Injury

"[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Board* v. *FCC*, 109 F.3d 418, 425 (8th Cir. 1996); *see also Packard Elevator* v. *ICC*, 782 F.2d 112, 115 (8th Cir. 1986) (noting that the alleged harm "must be actual and not theoretical" and movant must "show that the alleged harm will directly result from the action which [it]

14

seeks to enjoin"). The district court correctly explained that "there will likely be no harm to California at all." Ex. A at 44:23–24.

1. California first contends it suffers irreparable injury from the bankruptcy court's interpretation of GIPA because it has a "sovereign interest" in its laws. Mot. 15. But California points to no authority that a supposed misinterpretation of state law constitutes an irreparable injury to a "sovereign interest." And such an injury, even if it existed, is not irreparable. *Cf. In re Mount Moriah Elevator, Inc.*, 146 B.R. 451, 452 (W.D. Mo. 1992) (explaining that "creat[ing] a precedent which might have an adverse impact on other situations" does not constitute irreparable harm). California itself argues it has recourse to impose fines for non-compliance with its laws. Mot. 8. The debtors dispute that conclusion, but as the district court explained, "California's own law allows any applicable harm to be adequately measured and compensated." Ex. A at 45:6–8 (internal quotation marks omitted).

2. California also contends that customers who are unable to delete their data may be harmed. Mot. 16–17. But California has offered no evidence that such customers exist in its state, let alone articulated what *irreparable* harm these hypothetical customers might suffer. Ex. A at 45:11–13 ("California has not offered any evidence of customers in the state that cannot delete

15

their data but would like to do so.").  To the contrary, the unrebutted evidence at the sale hearing showed that, upon closing of the TTAM sale, customers' genetic information will remain in the same place, under the same management, and under the ownership of an entity controlled by the debtors' founder, largest pre-petition shareholder, and former chief executive officer—undercutting any argument that consumers will be harmed.  D. Ct. Dkt. 35-5 at 17. Nor does the possibility of mootness establish irreparable harm.  *See, e.g.*, *In re Eletson Holdings Inc.*, 2025 WL 726248, at *9 (Bankr. S.D.N.Y. Mar. 6, 2025).

3.      It is telling that California is the only state—of what was originally 34—still prosecuting an objection—the vast majority of other states stopped pressing their objections once the debtors exercised the "Equity Toggle" and TTAM self-imposed greater privacy protections based on input from those states latest procedurally improper and substantively baseless motion threatens to derail an extraordinarily successful bankruptcy case.

Moreover, California has never explained how irreparable injury results from approval of the sale order if the most likely alternative is for the debtors to exercise the Plan Toggle and sell their equity to TTAM via a plan of reor-

16

ganization.  If the stay is extended, the debtors will have no choice but to at-tempt to pursue the same sale to TTAM but under a plan of reorganization (rather than as a sale under section 363 of the Bankruptcy Code).  California conceded at the Sale Hearing that a plan sale to TTAM would not violate California state privacy law.  D. Ct. Dkt. 36 at 299:8–300:19.  Of course, an equity sale does not offend California state law—otherwise, 23andMe could never have been publicly traded.

Ultimately, that alternative would put the parties in the exact same place—but it would be more expensive and time-consuming to get there.  It will impose at least *$20 million* in avoidable losses on the estates, which will come out of the pocket of the debtors' stakeholders and, as the bankruptcy court found, will make customers *worse off*.  California has never explained how it can possibly be irreparably harmed by the fact that the TTAM sale is structured as one under section 363 of the Bankruptcy Code rather than under a plan of reorganization when the same result will ultimately be achieved either way—how can deploying a lower cost transaction to achieve the same end "irreparably harm" California?  The state has never answered that question because it cannot.

Appellate Case: 25-2361     Page: 19     Date Filed: 07/11/2025 Entry ID: 5536290

## C. Stay Would Cause Substantive Harm to the Debtors

The district court correctly determined that "a stay unquestionably would injure the other parties interested in the proceeding, and that injury far outweighs any harm to the movants." Ex. A at 45:18–22.

### 1. A Stay Jeopardizes Stakeholder Recovery And Threatens to Derail the TTAM Sale Closing

The TTAM Sale would generate $305 million for the debtors' estates, an amount that is expected to repay all creditors' claims and potentially return value to the debtors' public shareholders. It is supported by *every* economic stakeholder in these proceedings.

A stay of the sale order creates several risks to the transaction. The TTAM agreement includes the following condition to closing: "the Sale Order . . . shall have been entered by the Bankruptcy Court *and shall not be subject to stay as of Closing.*" D. Ct. Dkt. 41 § 9.3(b) (emphasis added). The agreement further states that "this Agreement may be terminated . . . by Purchaser . . . in the event that . . . one or more of the conditions to Purchaser's obligation to effect the Closing is or becomes impossible to satisfy at any time after the Execution Date . . . ." *Id.* § 10.1(e). Thus, as the bankruptcy court already found, a stay threatens to derail the TTAM sale. D.

18

Ct. Dkt. 35-10 at 79:20–25.  The debtors do not have a court-approved alternative to the TTAM sale.  Without the proceeds that would come from consummation of the sale, the debtors' stakeholders—creditors and shareholders—will suffer substantial harm to the order of tens or hundreds of millions of dollars.  D. Ct. Dkt. 35-5 at 17.  If a stay is granted, the sale cannot proceed.

### 2.    A Stay Will Significantly Increase the Costs of the Chapter 11 Cases

The harm to the debtors and their stakeholders is substantial and irreparably accrues every day the stay is extended.   Each day the TTAM sale is delayed causes the debtors to incur hundreds of thousands of dollars of operating expenses that would be borne by TTAM post-closing.

If the stay is extended, the debtors will have no choice but to attempt to pursue the same sale to TTAM but under a plan of reorganization (rather than as a sale under section 363 of the Bankruptcy Code).  But the debtors are  running out of time to even do that.  The court has not approved that option—an option which, based on unrebutted evidentiary record, will cause the debtors to lose *at least* $20 million.  D. Ct. Dkt. 35-7 ¶ 11.  Under the TTAM agreement, if the debtors elect to pursue the transaction under a plan, they must obtain a hearing on confirmation of this plan by September 15.  D. Ct. Dkt. 41 § 11.8.

19

Given applicable Bankruptcy Code provisions requiring minimum notice periods for creditors that would vote on confirmation of a bankruptcy plan, the debtors will need to obtain separate relief from the bankruptcy court to meet that September 15 deadline even today. Accordingly, obtaining relief to waive these statutory notice periods gets more difficult with each day that passes (and creditors will receive commensurately less notice). Even a very short administrative stay of a few days would force the debtors to exercise the Plan Toggle and unnecessarily incur at least $20 million in additional costs.

California faces no such prejudice. Despite two courts concluding that it lacks appellate standing, has no likelihood of success on the merits, will suffer no irreparable injury, and is acting contrary to the public interest, an administrative stay with no bond gives it a heckler's veto over closing, causing harm to all of the stakeholders that uniformly support the TTAM sale, despite it having no economic interest at all.

Moreover, the debtors have a debtor-in-possession financing loan that matures on September 30, D. Ct. Dkt. 35-7 ¶ 9. If the plan is not yet confirmed and effectuated, the debtors may not have the requisite funds to repay that loan. Thus, a stay risks that the debtors default on the loan, which would result

Appellate Case: 25-2361    Page: 22    Date Filed: 07/11/2025 Entry ID: 5536290

in a foreclosure and seizure of their assets, including the genetic information at issue here.

### D. Public Interest Weighs Against a Stay

The public interest disfavors stays because "the public interest favors the expedient administration of the bankruptcy proceedings." *See In re Savage & Assocs., P.C.*, 2005 WL 488643, at *2 (S.D.N.Y. Feb. 28, 2005). A stay would result in substantial delay to the debtors' bankruptcy cases and would impose significant costs on the debtors' estates, both delaying and directly reducing creditors' recoveries in these chapter 11 cases. D. Ct. Dkt. 35-7 ¶¶ 8–9. A stay is even less appropriate on these facts, where, as the bankruptcy court recognized, customers and other constituencies will be *better off* if the TTAM sale is effectuated. D. Ct. Dkt. 35-5 at 17–19.

## III. CALIFORNIA IS NOT ENTITLED TO INTERIM RELIEF

California also requests an interim administrative stay pending the resolution of its appeal of the district court's denial of the motion to stay. Again, the court may dismiss for lack of jurisdiction at any time. However, to the extent it considers the merits of the appeal, it should not grant California an administrative stay while doing so. An administrative stay will force the Debtors to exercise the Plan Toggle and unnecessarily incur $20 million in additional costs to do so, even if the stay is only a few days. *See supra* Section II.C.

21

This harm is accruing and irreversible. In any event, because of the applicable statutory notice periods for plan confirmation, the Debtors will very likely not have enough time to consummate a sale through the Plan Toggle, thus jeopardizing not only the $20 million in additional costs—but the entire $305 million in value to Debtors' stakeholders.

## IV.   IF THE COURT WERE TO GRANT A STAY, IT SHOULD BE SECURED BY A BOND OF NO LESS THAN $325 MILLION

The bankruptcy court concluded that, if it were to grant a stay, it would require California to post a bond of either $305 million (the purchase price under the TTAM APA) or $20 million (the estimated additional costs associated with the Plan Toggle). D. Ct. Dkt. 35-10 at 81:3–14. Because a bond protects "against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court," any continued stay should be conditioned on California posting a bond in the full amount of the potential harm to the debtors: $325 million. *See In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015).

California suggests that a bond is unnecessary and inappropriate because this appeal is not from a monetary judgment. Mot. 19. But Bankruptcy Rule 8007 does not limit bonds to cases involving a monetary judgment, and courts routinely require bonds for appeals of bankruptcy sales. *See, e.g.,*

*Ratcliff* v. *Rancher's Legacy Meat Co.*, 2020 WL 4048509, at \*14–15 (imposing $6 million bond to stay bankruptcy sale of property for $5.08 million). California relies only on *In re Sindesmos Hellinikes-Kinotitos of Chicago*, but that case is inapposite. There, unlike here "closing was not imminent," "alleviating" the court's concerns that the non-movant would be harmed. 607 B.R. 898, 911–12 (Bankr. N.D. Ill. 2019). And California's assertion that the Court should waive a bond because California is "acting in the public interest," Mot. 19, should be rejected where, as discussed, the public interest weighs *against* a stay.

*Finally,* California has been on notice since at least the sale hearing that a bond may be ordered in connection with any stay. It has had ample time to prepare for that possibility.

## CONCLUSION

The motion for stay should be denied.

23

Respectfully submitted,

/S/ JEFFREY J. RECHER

THOMAS H. RISKE                    PAUL M. BASTA
NATHAN R. WALLACE                  CHRISTOPHER HOPKINS
JACKSON J. GILKEY                  WILLIAM A. CLAREMAN
CARMODY MACDONALD P.C.             JEFFREY J. RECHER
  120 S. Central Avenue, Suite 1800    JESSICA I. CHOI
  St. Louis, MO 63105              GRACE C. HOTZ
                                   LYUBA SHAMAILOVA
JULY 11, 2025                      PAUL, WEISS, RIFKIND,
                                     WHARTON & GARRISON LLP
                                     1285 Avenue of the Americas
                                     New York, NY 10019

                                   KANNON K. SHANMUGAM
                                   PAUL, WEISS, RIFKIND,
                                     WHARTON & GARRISON LLP
                                     2001 K Street, N.W.
                                     Washington, DC 20006
                                     (202) 223-7300
                                     kshanmugam@paulweiss.com

24

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Jeffrey J. Recher, counsel for Debtors-Appellees and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 27(d)(2), Rule 32(a)(5), and Rule 32(a)(6), that the attached Debtors' Response to Appellants' Motion to Stay Appeal is proportionately spaced, has a typeface of 14 points or more, was prepared using Microsoft Word 365, and contains 5059 words.

/s/ Jeffrey J. Recher
JEFFREY J. RECHER

JULY 11, 2025

25

## CERTIFICATE OF SERVICE

I, Jeffrey J. Recher, counsel for Debtors-Appellees and a member of the Bar of this Court, certify that, on July 11, 2025, a copy of the attached Debtors' Response To Appellants' Motion To Stay Appeal was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

July 11, 2025

/s/ Jeffrey J. Recher
JEFFREY J. RECHER